

FILED
MIAMI COUNTY
COMMON PLEAS COURT

2015 OCT 14 AM 10: 32

JAN A. MOTTINGER
CLERK OF COURTS

## IN THE COMMON PLEAS COURT OF MIAMI COUNTY, OHIO
## GENERAL DIVISION

| | | |
|---|---|---|
| STATE OF OHIO | : | CASE NO. 13 CR 193 |
| PLAINTIFF | : | JUDGE CHRISTOPHER GEE |
| VS. | : | DECISION AND JUDGMENT ENTRY DENYING MOTION |
| ADAM L. JONES | : | FOR POST CONVICTION RELIEF |
| DEFENDANT | : | |

-----------------------------------------

The defendant, Adam Jones, has filed a petition for post-conviction relief asserting that he was denied effective assistance of counsel. Jones was indicted for and ultimately convicted of one count of Endangering Children, in violation of R.C. S2919.22(B), a felony of the second degree. He was sentenced on April 21, 2014, and the conviction was upheld on appeal.[1]

### Facts Of The Underlying Criminal Proceeding

B.L., the victim, was a four-year old girl, who was the daughter of Stephanie. Stephanie lived with the defendant, Jones, her boyfriend, in an upstairs room at the home of friends Jon and Jennifer, and their three young children. B.L. was born with VATER Syndrome, as a result of which she was missing certain organs, including the anus and the rectum, and had problems with other organs, including her liver, spine,

---

[1] State v. Jones, 2015-Ohio-196, (2nd Dist)

1

and vertebrae. When she was two, she had a multi-organ transplant, which included the liver, the small bowel, and the pancreas.

On August 5, 2010, and as a result of the VATER Syndrome, B.L. was on a lot of medication, which included Prograf, an anti-rejection medication for her transplanted organs. She also received fluids every night through a central line, on the left side of her chest. Blood was also drawn for testing weekly through B.L.'s central line. B.L. also had a feeding tube, a G tube, right below her rib cage on the left side. B.L.'s mother administered medicine through the G tube. B.L. also had an Ostomy bag for her stool, and a vesicostomy, or drain, for her undersized bladder, as a result of which she always had to wear a diaper. At night, B.L. could receive fluid nutrition through her G tube. At other times, she could receive it by means of a pump and line that were in a book bag that she could wear on her back, which allowed her mobility. At times during the day, B.L. would not be hooked up to anything, and she could move and play freely.

On July 17, 2010, B.L. tripped and fell face down on the linoleum floor in the kitchen. Other than B.L. crying briefly, she exhibited no other symptoms. Two or three days later, B.L. had a routine appointment at Cincinnati Children's Hospital, where she was being seen for VATER Syndrome. B.L.'s mother mentioned the fall days earlier, and a doctor examined B.L.'s face. No treatment was prescribed. A few days later, B.L.'s nose was swollen to the extent that she could not breathe through it. She went back to Cincinnati Children's Hospital, where she was treated for an infection in her nose. Infections were a serious problem for B.L., because the anti-injection drugs she was taking suppressed her immune system to some extent. She was discharged from the hospital on August 3, 2010.

2

According to B.L.'s mother, B.L. seemed to be normal after her discharge from the hospital on August 3rd. Two days later, on August 5, 2010, B.L. slept unusually late, until about 11:00. B.L.'s mother, Stephanie, took her friend, Jennifer, to the hospital in Sidney, Ohio, leaving at about 1:30 in the afternoon. Just before leaving, Stephanie and Jones laid B.L. down in her bed, since she seemed sleepy. Stephanie left B.L. in Jones's care. According to Stephanie, B.L. seemed fine and Stephanie did not observe any injuries.

Jones went downstairs and spent about 20–25 minutes with the children downstairs, who were playing a video game. Jones testified that he then went back upstairs, to find B.L. lying on her side on the floor. He said she was making a gurgling noise, "like maybe she was choking on something." He said her eyes rolled up into her head. He picked up B.L. in his arms, and asked the children downstairs to call 911. Not having access to a phone, and realizing he could not count on the children for assistance, Jones, with B.L. in his arms, first went to one neighbor's house, and then to the next, where he was able to have the neighbor call 911 for assistance.

The Piqua Fire Department paramedic responded to the scene at 2:25 p.m. He took B.L., by ambulance, to Upper Valley Medical Center, Emergency Department. Jones was not permitted to accompany them in the ambulance. From the Upper Valley Medical Center, B.L. was transported by careflight to Cincinnati Children's Hospital.

According to Dr. Charles Stevenson, a pediatric neurosurgeon at Cincinnati Children's Hospital, B.L. was critically ill at that time. She was placed on a breathing tube because she could not breathe on her own. She was unconscious and placed on a ventilator. From the CAT scans it was confirmed she had a large amount of bleeding on

3

the surface of her brain, on the left side; there was a large blood clot, a subdural hematoma. As described in the testimony of Dr. Charles Stevenson, "Because of this volume and the mass of the hematoma within the confines of the skull, the brain itself has been shifted over and is being pushed from that side—the left side, over to the right side."

Dr. Stevenson, who testified about the CT scan images, pointed out how certain brain structures had "... been pushed nearly two centimeters over to the side, which for the human brain is a very significant and extreme amount typically associated with very significant injuries."

Dr. Stevenson removed the left side of her skull, and then carefully removed the blood clot from the exposed surface of her brain. There was an active hemorrhage, and Dr. Stevenson stopped that fresh bleeding. When the indentation in the left side of B.L.'s brain caused by the clot refilled after the clot was removed, the brain continued to expand outward—the result of swelling of the brain caused by the injury. Consequently, the removed left side of B.L.'s skull was not immediately replaced, but was stored for future use. A monitor was then used to measure the pressure inside B.L.'s brain, so that medication could be administered to keep that pressure from becoming abnormal.

Thereafter, in Dr. Stevenson's words, B.L. "made an amazing and dramatic recovery." Within a day or two, she was able to open her eyes and breathe on her own. Within a few days, she began talking.

4

## The Post-Conviction Motion

The defendant's post conviction motion was accompanied by the affidavits of Robert K. Rothfeder, M.D., Kenneth Monson, Marvin E. Miller , M.D., and Andrew Wannemacher, and included medical records of the victim, two articles from medical journals and a copy of a report from Kathi L. Makoroff, M.D. After reviewing the motion and evidentiary materials, the court scheduled the motion for a hearing.

The Court of Appeals for the Second District has recently summarized the standards governing the defendant's motion:

> "Petitions for post-conviction relief are governed by R.C. 2953.21 through R.C. 2953.23. Under these statutes, any defendant who has been convicted of a criminal offense and who claims to have experienced a denial or infringement of his or her constitutional rights may petition the trial court to vacate or set aside the judgment and sentence. R.C. 2953.21(A). A post-conviction proceeding is not an appeal of a criminal conviction; it is a collateral civil attack on the judgment. *State v. Gondor*, 112 Ohio St.3d 377, 2006–Ohio–6679, 860 N.E.2d 77, ¶ 48, citing *State v. Steffen*, 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994); R.C. 2953.21(J). "For this reason, a defendant's petition for post-conviction relief is not a constitutional right; the only rights afforded to a defendant in post-conviction proceedings are those specifically granted by the legislature." *State v. Palmer*, 2d Dist. Montgomery No. 26279, 2014–Ohio–5266, ¶ 10, citing Steffen at 410, 639 N.E.2d 67 and *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999).[2]

In order to establish a claim for ineffective assistance of counsel Jones must demonstrate that: (1) his counsel's performance was deficient and fell below an objective standard of reasonable representation; and (2) he was prejudiced by his counsel's ineffective performance.[3] In order to show prejudice from his counsel's deficient

---

[2] State v. Royster, 2015-Ohio-625, ¶ 10 (2nd Dist.), appeal not allowed, 142 Ohio St.3d 1478, 2015-Ohio-2104, 31 N.E.3d 656, ¶ 10 (2015)
[3] State v. Bradley, 42 Ohio St.3d 136 (1989)

performance, Jones must prove "...that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."[4]

Counsel for the defendant assets four grounds that his former attorney, Andrew Wannemacher, was deficient in his representation:

1. Failure to reasonably investigate and challenge the medical records;

2. Failure to retain an expert to provide trial testimony;

3. Failure to call the Upper Valley Medical Center treating physicians and radiologists as witnesses;

4. Failure to impeach Dr. Makoroff with medical records that were readily available to him.

As discussed below, Wannemacher's representation of the defendant was not objectively unreasonable, the defendant was not prejudiced by counsel's performance, and the defendant has failed to show that the result of the trial would not have been different but for counsel's representation.

*1. Failure To Reasonably Investigate And Challenge The Medical Records*

The defendant maintains attorney Wannemacher failed to retain an expert who could review the medical records and assist him with cross-examination of the State's witnesses as well as providing testimony that contradicted the physicians who testified for the State of Ohio. Although Wannemacher did not ask the court for funds to retain an expert to assist with the review of records, he was able to engage the State's experts in

---

[4] Id; State v. Royster, supra.

6

lengthy discussions on cross examination about the existence and possibility of a prior subdural hematoma. He also obtained admissions from Dr. Stevenson as to the possibility of the existence of prior subdural hematoma.

Counsel for the defendant also claims that Wannemacher was unable to effectively cross examine the State's experts because he did not fully understand or appreciate the significance of all of the information contained in the 2,200 pages of medical records provided by the State. However, now that the defendant has retained experts, he has failed to point to any specific entries in the records of which Wannemacher was unaware, which would have assisted him in cross examination.

The major premise of the defendant's motion is a critique of the diagnosis of shaken baby syndrome by Dr. Makoroff. The defendant asserts that Dr. Makoroff's testimony was "flawed" in her conclusions that B.L. (1)did not have a blood disorder; (2) did B.L.'s injuries could not have resulted from a "short fall"; or (3) B.L. did not have a prior chronic subdural hematoma. Defendant's expert, Dr. Rothfeder, points to a single line in 2200 pages of medical records which states "Giving FFP for abnormal coags". Dr. Rothfeder testified at the post-conviction hearing that B.L.'s blood coagulation was abnormal at the time of her admission at Cincinnati Children's Hospital. On cross-examination, however, Dr. Rothfeder acknowledged that the note about "abnormal coags" was a misstatement and that B.L.'s blood coagulation was normal upon admission to the hospital. Her blood coagulation was only abnormal after the brain surgery, which is not an unusual occurrence for a child in her condition following surgery.

7

Defendant also argues that the testimony of Dr. Monson, a biomechanical engineer with no medical training and no clinical experience, demonstrates that B.L.'s injuries could have been the result of a short fall. According to Monson, experimental data shows that short falls can produce larger accelerations than shaking. During cross examination, however, Dr. Monson acknowledged that the studies are limited, as there are no studies conducted on living humans to directly measure the effect of forces on the brain.

In contrast, Dr. Shapiro testified for the State, that, in his vast clinical experience treating children, B.L.'s injury was not typical of a brain bleed from a short fall. According to Dr. Shapiro, children who suffer short fall injuries present with bleeding directly on the site of impact, not distributed in the manner of B.L.'s injury, which was consistent with a shaking injury. Dr. Shapiro also pointed out that children with short fall injuries also typically show minimal or no retinal hemorrhaging. According to Dr. Shapiro, in the case of B.L., the retinal hemorrhaging was of a devastating nature since it was in multiple layers.

Finally, there is little to no support for the theory that the child suffered a "rebleed." Dr. Makoroff ruled out the possibility that there was an acute on chronic subdural hematoma because there was no evidence of it during B.L.'s brain surgery, as reported by Dr. Stevenson, and there was no evidence of it in the facial CT scans taken several days prior. The defendant asserts that Dr. Stevenson admitted he would not have been able to see the old blood because of the active bleeding. However, Dr. Stevenson's specific testimony was that it "can be difficult" to see an underlying clot, and

8

that you "may not even be able to detect it". There was certainly no evidence that a chronic subdural hematoma caused the injury to B.L. on August 5.

Dr. Stevenson testified that if he had observed an older, even milder, subdural hematoma, he would have noted it in his report. As Dr. Shapiro testified, the CT scan shows different densities because it reflects the movement of blood, not old blood or new blood. B.L.'s recent facial CT scans, fail to show any bleeding, which would be expected if she had suffered a prior subdural hematoma.

Despite defendant's current assertions that trial counsel failed to challenge the State's theory and the medical testimony, attorney Wannemacher cross examined Dr. Stevenson at length regarding whether the CAT scan showed prior bleeding, and Dr. Stevenson conceded that is a consideration based purely on the CT Scan. He also conceded on cross-examination that he could have told the Lieutenant Byron that there was both new and old blood on the brain.

*2. Defense Counsel Failed To Retain An Expert To Provide Trial Testimony.*

Defendant argues that trial counsel was deficient in his failure to secure a medical expert, and explains what experts for the defense would have testified to if they had been secured. However, the failure of trial counsel to call these experts does not rise to the level of ineffective assistance of counsel, since the defendant has not shown a reasonable probability that the testimony of additional experts would change the outcome of this case.

According to the defense, Dr. Rothfeder would have testified that short falls can cause subdural hematomas, that the retinal hemorrhages have no diagnostic value, that

9

there was acute on chronic bleeding, and that B.L. had bleeding problem. The testimony of Dr. Shapiro, who supports the opinions and conclusions of Dr. Makoroff's trial testimony, calls into question the validity of testimony and opinions of Dr. Rothfeder, who lacks the clinical experience and expertise to credibly offer opinions on a child with B.L's. complicated and unusual medical conditions. During his career, Dr. Rothfeder has neither performed brain surgery nor treated any patients with VATER syndrome. In contrast, Dr. Shapiro's entire career has been devoted to the practice of pediatric medicine, treating tens of thousands of children and working almost his entire career in pediatric emergency care. Dr. Shapiro also has extensive experience in child abuse and neglect. He testified that it was an almost daily experience to treat a child or children for head trauma. Shapiro's experience included children who suffer short fall injuries and those that suffered abuse. In his experience, the injuries suffered by B.L. are consistent with those seen in children who suffer abuse injuries, and inconsistent with children who suffer accidental short falls.

The medical experts for the State and for the defendant agree that "short falls" can cause an intracranial injury, including bleeding. However, the subdural hematoma in B.L.'s case is not the type of bleeding typically seen in short falls, according to Dr. Shapiro. The bleeding in B.L.'s case showed the classic distribution seen in children with shaken injuries, and is very different from children who suffer short falls, according to Dr. Shapiro. Specifically, short fall injuries typically result in no retinal hemorrhaging or minimal, limited hemorrhaging to a small part of the retina. In contrast, Dr. Shapiro characterized, B.L.'s retinal hemorrhaging as extensive.

10

There is also no credible evidence that B.L. suffered acute on chronic bleeding, as Dr. Rothfeder concludes. The CT scan showed different densities, which in Dr. Shapiro's experience, is more consistent with active bleeding, or moving blood. The child's recent facial CT scan did not reveal any indication that B.L. suffered a prior subdural hematoma. Dr. Stevenson did not see evidence of a prior subdural hematoma during brain surgery, and B.L. did not suffer from any abnormal subdural space. Furthermore, the child's rapid decline in health on the day of the incident is inconsistent with a re-bleed.

Dr. Rothfeder also claims that B.L.'s retinal hemorrhaging has no diagnostic value. Not only does Dr. Shapiro disagree with that statement, but finds it irresponsible to ignore that hemorrhaging. The retinal hemorrhaging is not diagnostic but it is nevertheless valuable, as the patterns, extent, and the severity are consistent with abuse, and not with a shortfall.

Counsel for the defendant also claims that B.L. had a bleeding problem when admitted to Cincinnati Children's on August 5. The source of this claim, again, is a single line in her medical records that states B.L. is given FFP for "abnormal coags", an entry that was made following her brain surgery. Dr. Rothfeder testified on direct examination that the victim had abnormal blood coagulations upon her admission to the hospital, from which he concluded that B.L. presented to the hospital with a bleeding condition, thus causing or worsening her subdural hematoma.

During the trial, defendant's trial counsel did not cross-examine on that issue because there was no bleeding problem. B.L.'s coagulation studies were normal upon admission to the hospital and they were only abnormal following extensive brain

11

surgery, a not-unexpected complication for someone suffering from her injuries. Dr. Shapiro testified that, at the time B.L. suffered the intracranial injury, and prior to the brain surgery, she had no problem with coagulation. Dr. Shapiro explained that despite her complex medical history, B.L. was a stable and remarkable child, whose medical conditions were under great control. This is also supported by Dr. Stevenson's testimony that B. L. made an amazing and dramatic recovery.

Dr. Monson's is a biomechanical engineer whose expertise is limited to a laboratory. He has never worked with existing patients. Biomechanical engineers are not routinely employed by hospitals. Biomechanical engineers are not routinely consulted by doctors administering patient care. Dr. Monson has even worked with a neurosurgery department in a hospital and they still did not utilize him during patient care. Dr. Monson was not aware of any emergency rooms or trauma centers which employ the use of biomechanical engineers. Dr. Rothfeder, despite his claims in his sworn affidavit that biomechanical engineers are best suited to analyze how injuries may have occurred, has never consulted with them in his own practice, nor is he aware of any hospital that uses biomechanical engineers. Dr. Monson's expertise is in engineering, not medicine, and the court did not find his testimony particularly probative of the issues involved in the pending motion. On the basis of data compiled in a laboratory on subjects other than live humans, Dr. Monson testified that his research shows acceleration forces that are too low to cause injury by shaking. And when confronted with reports in which perpetrators have admitted to shaking their victims, causing injuries similar to B.L., Dr. Monson simply dismisses that with the assumption or suggestion that people may "falsely confess" or that there are "potential problems with those confessions". Dr.

12

Monson ignores both first-hand witness accounts of abuse and the vast clinical experience of child abuse physicians. However, Dr. Monson conceded that injuries as severe as those seen in B.L. are rare in short falls, a point consistent with Dr. Shapiro's testimony.

Dr. Makoroff's testimony at trial was that B. L. suffered abusive head trauma, the likes of which are consistent with shaking and impact with a soft surface. The defendant was not prejudiced by trial counsel's failure to call an expert to testify on his behalf. B.L.'s complex medical history causes Dr. Rothfeder to erroneously conclude she is chronically fragile and that must be why she was so badly injured. Dr. Makoroff and Dr. Shapiro, whose entire careers have exclusively involved the care and treatment of children, have the necessary medical training and clinical experience to know, to a reasonable degree of medical certainty, that B. L. suffered abusive injuries, consistent with their experience with both abuse injuries and accidental short falls. The proposed expert testimony would not have discredited Dr. Makoroff or Dr. Stevenson's testimony and would not have affected the outcome of the case.

*3. Defense Counsel Failed To Call The Upper Valley Medical Center Treating Physicians And Radiologists As Witnesses.*

Defendant argues that trial counsel was deficient in the failure to call witnesses from UVMC to testify that there was an acute on chronic subdural hematoma. Counsel for Jones further argues he was prejudiced by this, because the defense theory is that B.L. suffered a subdural hematoma from an earlier impact, namely, the fall in the kitchen that broke her nose several weeks earlier.

Whether or not trial counsel called any witnesses from UVMC, trial counsel did explore the existence of an acute on chronic subdural hematoma on cross-examination of both Dr. Stevenson and Dr. Makoroff. He engaged both experts in an extensive discussion about the existence and possibility of a prior subdural hematoma, and he obtained a number of concessions from Dr. Stevenson as to the possibility that a prior subdural hematoma existed. Also, there is little medical support that there was an acute on chronic subdural hematoma that caused B.L.'s injuries. The CT scan from UVMC alone is not sufficient to make that determination. The CT scan reveals the possibility of mixed density blood, but that is not substantiated by the prior facial CT scan from her nasal fracture showing no subdural hematoma at all or Dr. Stevenson's observation of B.L. during brain surgery. [5]

### 4. Defense Counsel Failed To Impeach Dr. Makoroff With Medical Records That Were Readily Available To Him.

Defendant argues that trial counsel's performance was deficient when he failed to impeach Dr. Makoroff with the medical records from UVMC on the issue of the acute on chronic subdural hematoma and the medical records from Cincinnati Children's on the issue of bleeding problems. As stated previously, trial counsel did cross-examine the State's experts about the possibility or existence of a previous subdural hematoma. Also, the medical records from Cincinnati Children's show that B.L.'s blood work was normal at the time she suffered the abuse and at the time she was admitted to the hospital and that it was only abnormal following surgery. The failure to use the medical records at trial did not change the outcome of the case.

---

[5] The decision to not call the UVMC radiologist as a witness may also have been to avoid the introduction of one of the conclusions reached by the radiologist: that "nonaccidental trauma must be suspected." See Exhibit E, attached to the petition for post conviction relief, which is only the first page of the radiologist report that appears to consist of two pages.

14

## CONCLUSION

Trial counsel's performance was not deficient and there was no prejudice to the defendant. Counsel made reasonable investigation into the case before the case through consultation with Dr. Miller and through his own independent research. Trial counsel made reasonable investigation into the case and, during the trial, conducted competent and thorough cross-examinations. Although defendant now claims that his trial counsel did not do enough, the standard is to measure his counsel's conduct against a standard of reasonableness, applying a heavy measure of deference to him. The defendant has failed to prove that his trial counsel was deficient.

Similarly, the defendant has failed to prove that the claimed errors by his former counsel would probably result in a different verdict. The court found the testimony of defendant's experts, Dr. Rothfeder and Dr. Monson, to have negligible probative value in evaluating their criticisms of and differences with the testimony of Dr. Makaroff and Dr. Stevenson. This conclusion is based in no small part on the vast difference in clinical experience between B.L.'s treating physicians at Cincinnati Children's Hospital and Dr. Rothfeder, and, in the case of Dr. Monson, the absence of clinical experience. The testimony of the defendant's experts does not demonstrate to this court a probability that the jury would have reached a different verdict.

The court finds the motion for post conviction relief is not well taken and it is denied.

IT IS SO ORDERED.

CHRISTOPHER GEE, JUDGE

15

A - 15

TO THE CLERK:

  The clerk is directed to serve upon all parties not in default for failure to appear notice of the judgment and its date of entry upon the journal. Within three days of entering the judgment upon the journal, the clerk shall serve the parties in a manner prescribed by Civ. R. 5(B) and note the service in the appearance docket.

                CHRISTOPHER GEE, JUDGE

Copies to:
Anthony E. Kendell, Prosecutor
Janna L. Parker, Assistant Prosecutor
Nikki Trautman Baszynski, Assistant State Public Defender
William J. Mooney, Assistant State Public Defender

16