# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

ADAM JONES,

              Petitioner,     :     Case No. 3:19-cv-180

- vs -                       District Judge Walter H. Rice
                                   Magistrate Judge Michael R. Merz

JEFF NOBLE, Warden,
  Madison Correctional Institution,

                            :

            Respondent.

# REPORT AND RECOMMENDATIONS

This is an action pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus which is before the Court for decision on the Amended Petition (ECF No. 3), the trial transcripts (ECF No. 6), the State Court Record (ECF No. 7), the Return of Writ (ECF No. 8), and Petitioner's Reply (ECF No. 16). Petitioner pleads one ground for relief:

> **Ground One:** Adam Jones received constitutionally ineffective assistance of counsel at trial due to counsel's failure to secure and present medical expert and biomechanics expert testimony on shaken baby syndrome.
>
> **Supporting Facts:** Trial counsel failed to secure and present medical expert testimony and biomechanics expert testimony on shaken baby syndrome at trial.

(Amended Petition, ECF No. 3, PageID 89).

**Litigation History**

On May 24, 2013, a Miami County grand jury indicted Jones on one count of endangering children in violation of Ohio Revised Code § 2919.22(B)(1)(E)(1)(d) for recklessly causing serious physical harm to a child by abusing her (Indictment, State Court Record, ECF No. 7, PageID 806). The offense was alleged to have occurred on August 5, 2010.[1] Jones was found guilty by a jury and then sentenced to eight years imprisonment. The Ohio Second District Court of Appeals affirmed and Jones took no further direct appeal. *State v. Jones*, 2015-Ohio-196 (2nd Dist. Jan. 23, 2015). Shortly before that decision, Jones filed a petition for post-conviction relief under Ohio Revised Code § 2953.21. After a three-day evidentiary hearing, the Common Pleas Court denied the petition and Jones appealed. The Second District again affirmed. *State v. Jones,* 2018-Ohio-673 (2nd Dist. Feb. 23, 2018), Supreme Court jurisdiction declined, 2018-Ohio-2380. With the assistance of counsel,[2] Jones filed the instant federal habeas petition on June 16, 2019, which Respondent concedes is timely (Return, ECF No. 9, PageID 1391).

**Positions of the Parties**

Jones presents one ground for relief, to wit, that he received ineffective assistance of trial counsel when his trial attorney failed to secure and present expert medical testimony and expert biomechanics testimony on abusive head trauma, also known as shaken baby syndrome.

---

[1] The original date in the Indictment was amended to correct a typographical error (State Court Record, ECF No. 7, Exs. 3 and 4).
[2] The Ohio Public Defender began representing Jones when he filed his petition for post-conviction relief in the Miami County Court of Common Pleas and continues to represent him in this Court.

Respondent raises no procedural defenses, but asserts the Second District's opinion on post-conviction appeal is entitled to deference under 28 U.S.C. § 2254(d). It is that decision this Court must review, since it is the last reasoned decision of the Ohio courts on the ineffective assistance of trial counsel claim. Y*lst v. Nunnemaker*, 501 U.S. 797 (1991).

**The Second District's Decision on Post-Conviction Appeal**

Judge Hall wrote a sixty-three page opinion for the Second District discussing the case in meticulous detail. Rather than quote that opinion at length, the Magistrate Judge will summarize it with references to the reported decision.

First the court gives the factual background from the trial.

> {¶ 3} The record reflects that a jury convicted Jones on one count of child endangering, a second-degree felony. The 2014 conviction stemmed from a head injury sustained by "Marianne,"[3] the four-year-old daughter of Jones' girlfriend, while the child was in his care. On August 5, 2010, the child's mother and Jones put the child down for a nap in an upstairs bedroom of the house where they were living with friends and the friends' children. The mother then left the house, and Jones was the only remaining adult with Marianne and the friends' children. Jones said he then went downstairs and watched the friends' children play a video game. Within about 20 minutes, he said he went back upstairs and found Marianne lying on her side on the floor. He testified that her eyes were rolled back in her head, and she was gurgling. Jones carried the child to a neighbor's house and called for help. A paramedic arrived and transported the child to Upper Valley Medical Center (UVMC). Her mother also responded to the hospital. She testified that at UVMC the child had a large knot on the left side of her forehead and bruising on the left ear, neither of which was there when she left the child at home with the appellant. Marianne's mother testified that the remains of the knot were also visible in State's photo Exhibits 11 and 12, taken several days after the incident, which depict an obvious abrasion on the left forehead. At UVMC, the child was unconscious, had a CAT scan performed, had a ventilator with a

---
[3] The Court used a pseudonym because the victim is a minor child.

breathing tube applied, and then was care-flighted to Cincinnati
Children's Hospital.

*Jones*, 2018-Ohio-673 (original footnote omitted). The court then summarizes the medical testimony from trial. Dr. Charles Stevenson, the pediatric neurosurgeon who treated Marianne on admission in Cincinnati, testified he removed the left side of her skull and found a large subdural hematoma; he saw no evidence of a prior subdural hematoma. *Id.* at ¶¶ 4-5. He testified that subdural hematomas are "almost always caused by traumatic injuries." *Id.* He also found no connection between her serious injury on August 5, 2010, and her condition known as VATER Association[4] or her recent nasal fracture. *Id.* at ¶ 8.

Dr. Kathi Makoroff, a pediatrician board-certified in child abuse, consulted in Marianne's treatment in Cincinnati "and ruled out causes of the child's subdural hematoma other than a traumatic injury involving 'a great bit of force'," rejecting other causal theories offered by the defense. *Id.* at ¶¶ 9-14. She ruled out as a cause a possible fall or even jump from Marianne's bed onto the carpeted floor of the room where she slept.

Judge Hall quoted his court's direct appeal conclusion on the cause of Marianne's injuries:

> {¶ 30} In the case before us, the circumstantial evidence is compelling that Jones physically abused Marianne, and thereby caused her serious physical harm. When Marianne was left in his care, she did not have the brain injury that she had after she was in his care. He was the only adult in her presence. By his admission, the three other children in the house were on another floor, playing a video game.
>
> {¶ 31} Drs. Stevenson and Makoroff ruled out possible causes of Marianne's injury other than physical abuse, either in the form of impact to Marianne's head against a soft surface, or severe shaking. Under the circumstances, a reasonable trier of fact could conclude that Jones was the person who caused Marianne's injury, if not intentionally, at the very least recklessly, since a reasonable person

---

[4] Judge Hall describes VATER Association as a rare medical condition which had caused Marianna to undergo approximately twenty-five surgeries, including multiple abdominal organ transplants. *State v. Jones,* 2018-Ohio-673 at ¶ 7. It is undisputed that Marianne suffered from this congenital condition.

4

would know that the impact to Marianne's head or the severe shaking necessary to cause her injury would likely cause her serious physical harm.

*Jones*, 2018-Ohio-1673 at ¶ 18, quoting *State v. Jones,* 2015-Ohio-196.

As noted, the trial court held an evidentiary hearing in post-conviction. Jones submitted live testimony from Dr. Robert Rothfeder and his trial attorney, Andrew Wannamacher, as well as the video deposition of Kenneth Monson, an associate professor of mechanical engineering at the University of Utah who was presented as an expert on biomechanics. Wannamacher admitted that his failure to obtain an expert at trial was not the result of a strategic decision.

Dr. Rothfeder did not render an opinion within a reasonable degree of medical certainty as to the cause of what he surmised was a chronic subdural hematoma, and he could not indicate when it originated." *Id.* at ¶ 25. Having discussed his testimony at length, the Second District concluded

> A fair evaluation of his testimony is that he does not believe in the diagnosis of abusive head trauma because one cannot divine intent from an unobserved mechanism of injury. He agrees the diagnosis is accepted by the majority of pediatricians and the position papers of the number of organizations that support the diagnosis, which he gratuitously referred to as "the political statements that derive from those organizations."

*Jones*, 2018-Ohio-1673 at ¶ 29. The court noted that Dr. Rothfeder had left the active practice of medicine, become an attorney, and

> [O]ver the past ten years … developed a focused interest in child abuse and infant brain injury. He spends the vast majority of his professional time consulting on medical issues most of which are child abuse head-injury cases. In the last ten or fifteen years, he has testified only for the defense. He estimated he has testified between one and two hundred times on this topic.

*Id.* at ¶ 22.

Kenneth Monson offered testimony in post-conviction of the amount of force needed to

produce significant head injuries, but

> He also stated that he could not draw a conclusion in the present case as to whether a short fall in fact produced Marianne's injury. Monson recognized that if Marianne had been shaken and then "slammed" against something causing an impact, the slamming would significantly increase the acceleration and deceleration levels. He reiterated, however, that "the accelerations associated with shaking are very low compared to the thresholds for injury * * * like a subdural hematoma[.]" (*Id*. at 82). Finally, when asked whether the injury in this case was from a short fall he said "I can't actually draw an opinion on what - - what caused it."

*Jones*, 2018-Ohio-1673 at ¶ 37.

In rebuttal in post-conviction, the State called Dr. Robert Shapiro, a child abuse pediatrician from Cincinnati Children's Hospital who has testified between 400 and 500 times in child abuse cases in the past twenty-five years, mostly for the prosecution because when he opines against child abuse, the case is not prosecuted. *Id.* at ¶ 39. He opined that biomechanical studies are "flawed" and "limited right now" as to forces generated from different traumatic events involving children. *Id.* at ¶ 40.

The Second District concluded that Dr. Shapiro compellingly contradicted Dr. Rothfeder regarding whether Marianne had an older, chronic subdural hematoma and a newer, acute subdural hematoma, *i.e.*, "old" blood and "new" blood, giving four distinct reasons why Rothfeder's supposition is incorrect." *Id.* at ¶ 41. On the scientific basis for Dr. Rothfeder's rejection of abuse head trauma or shaken baby syndrome, the Court found

> {¶ 44} With regard to whether abusive head trauma or shaken baby syndrome is widely accepted, Shapiro testified it is widely accepted in a large number of medical fields. In regard to those who do not believe in the diagnosis, he said:
>
> > * * * It's a tiny fraction of the medical community that speaks a very loud voice. There's broad acceptance and concurrence among neurosurgeons, neurologists, radiologists, pediatricians in the diagnosis of shaken baby

6

> syndrome. We have no debate. There is no debate in the medical field, except for a small handful of individuals who, for whatever reasons, feel that they need to speak very loudly about a so-called debate. The debate is trumped up and doesn't exist.

*Jones*, 2018-Ohio-1673 at ¶ 44, quoting post-conviction transcript at 33.

Applying the law to this trial court record, the Second District cited the controlling precedent for ineffective assistance of trial counsel claims, *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at ¶ 52. Jones had raised four grounds for relief in post-conviction, only the second of which is carried forward in the Petition here. Jones had asserted his counsel was ineffective when he "failed to retain an expert to provide trial testimony." *Id.* at ¶ 59.

The Second District found Jones had satisfied the first *Strickland* prong, deficient performance. *Id.* at ¶¶ 60-62. As to the second prong, requiring proof of prejudice, Judge Hall wrote:

> {¶ 63} The remaining issue is whether Jones was prejudiced by defense counsel's failure to retain an expert and/or to call an expert to testify at trial to rebut the State's experts. The trial court found no prejudice to Jones based largely on its evaluation of the credibility of the competing experts. With regard to defense experts Dr. Rothfeder and Monson, the trial court found that the nature of their experience made them less credible than the prosecution's experts. It reasoned:
>
>> The court found the testimony of defendant's experts, Dr. Rothfeder and Dr. Monson, to have negligible probative value in evaluating their criticisms of and differences with the testimony of Dr. Makoroff and Dr. Stevenson. This conclusion is based in no small part on the vast difference in clinical experience between [Marianne's] treating physicians at Cincinnati Children's Hospital and Dr. Rothfeder, and, in the case of Dr. Monson, the absence of clinical experience. The testimony of the defendant's experts does not demonstrate to this court a probability that the jury would have reached a different verdict.

7

{¶ 64} The trial court also found more credible the prosecution experts' testimony about retinal hemorrhages, the "re-bleed" dispute, the inability of a short fall to cause Marianne's injuries, and abusive head trauma actually causing the child's injury. We recognize that "expert witnesses in criminal cases can testify in terms of possibility rather than in terms of a reasonable scientific certainty or probability." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 77. "The treatment of such testimony involves 'an issue of sufficiency, not admissibility.'" *Id.*, quoting *State v. D'Ambrosio*, 67 Ohio St.3d 185, 191, 1993-Ohio-170, 616 N.E.2d 909 (1993). But when experts testify about a variety of possibilities or about underlying suppositions that are unsupported by the weight of the evidence, the strength of their opinions has less weight than those expressed to a reasonable medical certainty.

{¶ 65} As set forth above, Dr. Rothfeder opined that it would be impossible "to draw definite conclusions in terms of the cause of [Marianne's] acute subdural with any reasonable certainty" and that it would be impossible "to conclude that those injuries were the result of child abuse." (T-PCR-1, 17.) But a fair reading of his entire testimony is that he would testify to that effect regardless of the medical aspects of this case because there was no witness to or admission about the mechanism of injury and in those circumstances he does not believe in the abusive head trauma/shaken baby diagnosis at all. (T-PCR-1, 37.) The potential contributing causes Dr. Rothfeder identified were re-bleeding of a prior, chronic subdural hematoma, a complex patient with ongoing infection related to the earlier nasal fracture, a "short fall," and his mistaken bleeding disorder, none of which did he specify was the probable or reasonably certain cause of Marianne's injury. We previously indicated Appellant complains that in closing argument, the prosecutor seized on the absence of any competing expert testimony at trial and "emphasized that 'no doctor or any other witness ever said there is an old injury that's related to the injury [Marianne] suffered'." (Appellant's Merit Brief at 6.) Even if Jones' post-conviction medical expert had testified at trial, the preceding closing argument could still accurately and correctly have been made because that defense expert testified in terms of possibilities rather than certainty or probability. For instance, regarding the existence of a chronic hematoma, he stated: "So a variety of possibilities are in play * * *." (T-PCR-1, 30). And with regard to the possibility of spontaneous or mild trauma as a cause of re-bleeding, he said: "[W]hat I'm talking about now is not the type of phenomenon that is now well understood or completely understood or has been you know historically clarified over time. It's not the kind of thing that physicians have a perfect handle on. So everything I'm talking about

remains in a — a state of incomplete understanding as — as medicine presently exists." (*Id.* at 32.) Moreover, had the defense called Dr. Rothfeder at trial, his mistaken testimony about Marianne's non-existent bleeding disorder, which he said contributed to his analysis, likely would have resulted in further loss of credibility with the jury.

{¶ 66}  The trial court additionally discredited Monson's testimony because he lacks clinical experience, biomechanical studies have not been performed measuring the effect of impact forces on the brains of live humans, and Monson's experience is laboratory in nature and hospitals do not employ biomechanical engineers.  In our view, taking Monson's testimony at face-value [sic] leads to the conclusion that an intensely forceful event occurred in Marianne's bedroom, which is consistent with the opinions of Drs. Stevenson, Makaroff, Gray, and Shapiro and contrary to the opinions of Dr. Rothfeder.

{¶ 67}  To be sure, we recognize that there are those, including Jones' post-conviction experts, who reject the diagnosis of abusive head trauma.  Our research, and the evidence in this case, supports a belief that acceptance of the diagnosis is by far the prevailing view. *See, e.g.*, Sandeep Narang, M.D., J.D., *A Daubert Analysis of Abusive Head Trauma/Shaken Baby Syndrome*, 11 Hous. J. Health L. & Pol'y 505-633 (2011).  Criticism is often fostered by the legal defense community adopting the minority medical opinion.  *See, e.g.*, Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 Wash. U. L.Rev. 1, 27 (2009).  Some courts have also joined the fray by doing their own literature analysis to support a conclusion for one side or the other.  *See, e.g., Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) (citing biomechanical and other studies raising doubt about shaken baby syndrome, most particularly whether it can be caused by shaking alone).  But our function and duty is not to weigh in or vote for one side or the other, let alone solve any disagreement of some in the medical community.  Nor is it our position to substitute how we might have ruled on the petition if we had considered it in the first instance.  Our review is to determine whether the trial court abused its discretion in its ruling.

{¶ 68} Having painstakingly reviewed the record, we conclude that the trial court's credibility analysis was not unreasonable and did not in itself constitute an abuse of discretion.  We also determine that the trial court did not abuse its discretion when it concluded that the post-conviction evidence, in the context of the entire record, would not support a reasonable probability of a different result.  Finally,

> Jones' post-conviction evidence is not sufficient to undermine our confidence in the outcome of his trial.

*Jones*, 2018-Ohio-1673.

Petitioner argues the Second District's decision is not entitled to deference under the AEDPA. Rather, he claims the trial jury should have been presented with the full range of "competing perspectives" on the shaken-baby dispute:

> The current status of the shaken-baby dispute can best be characterized as a stalemate. It involves two entrenched, oppositional camps. Both sides insist that to fully join one camp over the other requires the willful disregard of significant, nuanced, complex factors. The traditional approach has been that experts can and do know with certainty when abuse, to the exclusion of any other alternative, was the cause of injuries due to their interpretation of certain factors that injured children present. The competing perspective developed in recent years by leading national experts asserts that abuse cannot be confirmed with certainty based solely upon the certain identified factors, and further contends that there are alternative explanations for those same factors. Through postconviction litigation in this case, experts on each side of this divide testified regarding the evidence against Mr. Jones. The expert opinions detailed in that litigation reflected the deadlock that clouds the larger dispute.
>
> * * *
>
> [A] factfinder cannot reliably and fairly decide a specific dispute in this area without hearing the entirety of each competing viewpoint.
>
> * * *
>
> [I]t was unreasonable for the state courts to . . . preclude the jury from hearing the full viewpoint of both sides to decide this case.

(Reply, ECF No. 16, PageID 1512-14.)

# Analysis

There is no direct evidence of Adam Jones's guilt of child abuse. That is, no one testified to seeing him injure Marianne. Jones and Stephanie Long, Marianne's mother, put her down for a nap and she was at that time uninjured. Jones testified he left her and went downstairs to sit with the other children who live in the house who were playing video games. When he went back twenty minutes later to get dressed, he found her in a badly injured state. Since there is no direct evidence of what happened in Marianne's room during those twenty minutes, the truth of what happened must be inferred from the circumstances.

If Adam Jones was to be convicted of causing Marianne's injuries, the jury had to decide his guilt on circumstantial evidence alone. That was the jury's task. With respect to Petitioner's argument, it was not to decide general issues in the forensic community about whether the "traditional"[5] theory of shaken baby syndrome should prevail or some competing theory. It is this case, not some other generalized or hypothesized child abuse case, which they jury had to decide. It is the Second District's handling of that case on post-conviction that this Court must evaluate.

The State proved its case to the satisfaction of the jury beyond a reasonable doubt by presenting expert witness testimony, not of persons with expertise in child abuse generally, but of the operating pediatric neurosurgeon, Dr. Stevenson, and of Dr. Makoroff, a pediatrician board-certified in child abuse, who consulted in this case. Both employed the technique of differential diagnosis to rule out causes of Marianne's injuries other than child abuse.

Differential diagnosis is considered to be "a standard scientific technique of identifying the cause of a medical problem by eliminating the probable causes until the most probable one is

---

[5] Petitioner's term. See Reply, ECF No. 16, PageID 1512.

isolated." *Best v. Lowe's Home Centers, Inc.,* 563 F.3d 171, 178 (6th Cir. 2009), quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001).

> We hereby adopt the following differential-diagnosis test, adapted from the Third Circuit's well-reasoned opinion: A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor (1) objectively ascertains, to the extent possible, the nature of the patient's injury, see *id.* at 762 ("A physician who evaluates a patient in preparation for litigation should seek more than a patient's self-report of symptoms or illness and . . . should . . . determine that a patient is ill and what illness the patient has contracted."), (2) "rules in" one or more causes of the injury using a valid methodology, and (3) engages in "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a conclusion as to which cause is most likely.

*Best* at 179, citing *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 760 (3rd Cir. 1994). Petitioner asserts this "process of elimination is the specific theory that breeds the impasse in this debate. . . ." (Reply, ECF No. 16, PageID 1513.) But as the quoted authority from the Sixth Circuit shows, differential diagnosis, which involves eliminating possible causes for a medical condition, is a universally used diagnostic method in no way limited to child abuse cases.

Using their observations of Marianne and applying differential diagnosis, Drs. Stevenson and Makoroff ruled out possible causes other than child abuse for her injuries. Jones's trial attorney made a wholehearted attack on that conclusion by hypothesizing other possible causes and attempting to elicit admissions that there could have been another cause, to wit, a fall from the bed or the residual impact of her recent nasal fracture. He was unsuccessful.

The Second District held Wannemaker performed deficiently in not engaging an expert who could have provided a competing differential diagnosis, one which would have explained Marianne's injuries without any misconduct on Jones's part. That holding is binding on this Court.

But the Second District also held Jones did not prove he was prejudiced by this deficient

12

performance. In doing so, it evaluated not the universe of possible experts who could have been called, but the experts actually put forward by Jones in post-conviction. It found those particular experts – not some hypothetical other experts – not to be credible on the causation issue.

Dr. Rothfeder's opinion is **not** that in the particular circumstances of this case, abusive head trauma could be ruled out. Rather as the Second District read him, Dr. Rothfeder believes shaken baby syndrome must be ruled out – at least to the extent of supporting a conviction – in every case where there is neither an admission nor direct testimony of abuse.[6] Thus, Dr. Rothfeder is not an expert who, upon examination of the facts of this particular case, would come to a different diagnosis from Drs. Stevenson and Makoroff. Rather it seems he takes the legal position that circumstantial evidence alone, even as interpreted by medical doctors, can never be enough to convict in a child abuse case. That is not, however, the law.

> [A] Court may sustain a conviction based upon nothing more than circumstantial evidence. *United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006)("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."); *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994)(same). Indeed, the Supreme Court has explained that circumstantial evidence is "intrinsically no different from testimonial evidence," and that both "may in some cases point to a wholly incorrect result." *Holland v. United States*, 348 U.S. 121, 140 (1954). "Yet . . . [i]n both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference." *Id.* at 137-38. To accomplish this, "the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." *Id.* at 138.

*Tucker v. Palmer*, 541 F.3d 652, 657 (6th Cir. 2008)(parallel citations omitted).

Given Dr. Rothfeder's background and strong conclusions, it is doubtful he could have qualified as a testifying expert under the guidelines adopted in *Daubert v. Merrell Dow*

---

[6] Petitioner does not argue that this is a misreading of Dr. Rothfeder's testimony.

13

*Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). He does not support his opinions by reference to peer-reviewed scientific or medical journals and his career since he left the practice of medicine has been devoted to defense work in child abuse cases, leading one to question how unbiased it is. *Daubert* is, of course, not binding on the state courts. But its criteria for the scientific reliability of expert testimony surely can be considered in assessing a state court determination of the relative credibility of experts.

The Second District's weighing of the competing credibility of Drs. Stevenson, Makoroff, and Shapiro with that of Dr. Rothfeder is entitled to deference because it is based on criteria – including the small minority position represented by Rothfeder's views – which are entirely appropriate for credibility considerations. To put it another way, there might have been other experts, such as those who testified in *People v. Bailey*, 47 Misc. 3d 355 (N.Y. Sup. Ct. Monroe Cty. 2014), who would have given a more nuanced opinion on Marianne's injury. But Dr. Rothfeder would have been subject to the same criticisms at trial as he was on post-conviction, and it seems very unlikely, therefore, that his testimony would have changed the result.

Dr. Monson, the biomechanics expert presented in post-conviction, also did not have an opinion on the cause of Marianne's injury that was inconsistent with those offered by the prosecution experts.

In sum, Jones's case might have been prejudiced by the failure to present some other medical and/or biomechanical experts than Drs. Rothfeder and Monson, but the Second District's conclusion that failure to present these two particular experts did not result in prejudice is not an unreasonable application of *Strickland*.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends that the Petition be dismissed.

However, Jones should be granted a certificate of appealability on his single ground for relief. The Second District's decision on post-conviction was divided and the dissent is by an eminently reasonable jurist, Judge Jeffrey Froelich, proving that reasonable jurists could indeed doubt the Magistrate Judge's conclusion.

November 13, 2019.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).